Chief Justice Bibb
delivered the Opinion of the Court.
Jarrett declared against Higbee in a plea of trespass vi et armis, for taking and imprisoning a slave, the property of the plaintiff, and 'detaining him, and for loss of service, and for expense in regaining the possession.
Higbee pleaded not guilty, and also justified, because he apprehended the negro man in the highway, in Fayette county, suspected to be a runaway, and carried him before two justices of the peace for the said county, Oliver Keene and Matthew Elder, and the owner of the said slave not being sufficiently identified to the satisfaction of the justices, he the said justice Elder caused the said slave to be committed to the jail of Fayette county, which is the same trespass in the declaration mentioned &c-
To this plea the plaintiff demurred; his demurrer was overruled.
Upon leave given to reply, the plaintiff filed a replication, that the defendant well knew, and the said justice of the peace well knew that said slave was the property of the plaintiff, a citizen of this Commonwealth.
To this replication the defendant demurred; the demurrer was sustained.
Upon leave to amend the replication the plaintiff replied, that the defendant committed the trespass in the declaration, of his own wrong and without any such cause as in the plea is alleged. The issue was found for the defendant, and judgment given accordingly.
In the progress of the trial the plaintiff took a bill of exceptions which states:
That the plaintiff proved by the jailor of Fayette county, that the defendant brought the slave to the *547 jail to be committed as a runaway, taken up by defendant; the jailor refused to receive him without a mittimus; the defendant went away with the slave and returned with a mittimus, which the witness produced; it is signed by Matthew Elder, the justice, bears date on the tenth of October, 1822, and directed to the jailor of Fayette county; it recites that John Highee, jr. had that day made oath before him, that Allen, a slave, the property of John-Jarrett of Livingston county, Kentucky, appears to be a runaway, and tiiat he had taken him up as such; that it also appeared to him, the justice, froin certain papers in possession of said slave, purporting to be a pass or permit from said Jarrett, together with the certificate of J. Phelps, clerk of Caldwell county, with the county seal annexed, bearing date •30th October, 1822, “all of which appearing to me to be a forgery;” therefore said justice ordered that said Allen be committed to the jail of Fayette, there to remain until answer can be had from said John Jarrett, which the jailor will procure as speedily as possible. Upon this mittimus the jailor confined the slave in jail 68 days, until he wrote to the .plaintiff, -who came up to Lexington, proved his property and paid fees, amounting to upwards of thirty-two dollars, and took the slave away; that the defendant acknowledged, that when he took up the slave he produced a paper in these words:
Mittimus.
Pass of the slave given him bv plain? tiff.
“Know all men by these presents, that I, J. Jarrett, of Livingston, and State of Kentucky, do agree that this black man Allen, do bargain and trade for himself until the first day of May next; and also, for to pass and repass from Livingston county, Kentucky, to the Monongalia county, State of Virginia, Morgantown, and then to return home to the same Livingston county, Kentucky, again, near the mouth of Cumberland river, Smithland. Given under my hand this 26th day of September, 1822.
Witness, Thomas Jarrett, John Jarrett. ”
On this was endorsed a certificate purporting to be from the clerk of Livingston, with the county seal, bearing date 30th of September, 182,2.
Endorsement on the pass, purporting to be by iho clerk with his seal,
Evidence of the defendant.
Instruct ions m0Vecl by the plaintiff, but Ntho
*548 “The within pass of Allen, the bearer hereof, was produced to me and by request I annex the county seal thereto,” with a farther certificate that he was acquainted with thg giver of the pass, Mr. John Jarrett of Livingston county, and that all persons would do well to let the bearer pass and repass, to and from Monongahelia county Virginia, to his said master. “In testimony whereof, I have set my hand and affixed the seal of said county, this 30th of (September, 1822.”
To this certificate there was a seal but no signature; this and a similar one, with J. H. Phelps’ name, bearing a date not then arrived, which Higbee said he Siad taken from the slave, were left with the jailor; both these were given up by the witness to Jarrett, with the slave; that he, the witness, suspected the slave to he a runaway, on account of the suspicious appearance of the passes, but it* turned out that he was not, as Jarrett acknowledged he had given the passes; that $40 was a fair compensation to come from Livingston and carry the slave home. It was agreed that the distance from Livingston to Fayette, is between 230 and 250 miles.
The defendant proved by Gatewood, that lie saw the defendant when examining the passes, and advised him to take up the slave as a runaway. The negro got in a rage at being called a runaway, and drew out of his boot another pass; one of the passes was dated on a day not then arrived; one was the paper produced in court. The witness advised .Highee to take him to jail, as he still believed him to be a runaway. Oliver Keene, the justice, proved that Hi'gbce brought file negro before him as a justice of.'the peace, that he, the justice, would have committed him, as he suspected him as being a runaway, and believed his passes illegal; there were two, one dated on a day not then arrived; having other business of the Commonwealth to attend to, the mittimus ivas made out by Matthew Elder, ano-1 ther justice present.
Upon this evidence the plaintiff moved the court for instructions to the jury:
Instructions ¡’Ni'10 piry, ° le
First: That if theylbelieved that the slave was possessed of the pass produced in evidence, and did exhibit it to the defendant when taken up, and that the same was executed and delivered to the slave by his master, it should have protected him, and his arrest was illegal.
Second: That if Higbee took up the slave as a runaway, and discovered that he belonged to a resident of this Commonwealth, he was bound to have carried him to the place whence he fled, or to deliver him to the owner, and is answerable to the plaintiff in damages for any injury resulting from a different disposition of the slave.
Third: That the mittimus produced and proved by the jailor, is void:
Fourth: That the authority- of Matthew Elder, as contained in the mittimus, is no justification for the defendant in committing the slave to jail, the justice having no jurisdiction to commit a runaway belonging to a citizen of th.is state, that fact being known to the justice.
The court refused those instructions and instructed the jury:
That if the defendant took up the slave in good faith, having reasonable grounds to suspect he was a runaway, he was justifiable.
That the warrant of committal issued by the justice, was evidence of reasonable ground of such suspicion.
That the commitment was the act of the justice, for which the defendant was not liable, nor for the detention upon the committal.
The questions involved in the plea of justification and demurrers, are so far involved in the mo-, tion for instructions, and the resolutions of the court thereon, that they need not be considered seperately.
The first instruction moved by the plaintiff, asks the court to declare to the jury, in case they find ike paper called a pass, of the 26th September, Í822, *550 was executed and delivered by Jarrett, to tbe slave* and by him produced to Higbee, it ought to have protected the slave from arrest.
A pass to a slave by the owner, giving him liberty to pass and reÍiass from jivingston to Virginia, and bargain and trade for himself, from Sep tombev till May, is against law and-furnishes the slave no protection against arrest as a runaway.
This proposition as asked, considered in connexion with the whole evidence in the cause, asserts as matters of law: 1st, that the paper was a lawful pass or permit* which Higbee was bound to respect; 2d, that if a slave exhibits a pass which turns out in fact to have been given by the master, the person who arrests him as a runaway, is liable to be treated as a trespasser, however well fortified he may have been by the circumstances, in suspecting and believing the slave to be a runaway; 3dly, that the defendant-acted without probable cause, in arresting the slave.
This first instruction asked, supposes that Higbee and all others were bound, at their peril, to yield obedience to the permit contained in the paper exhibited. To this the court cannot assent. The paper contains,' on the part of the plaintiff, an agreement that the slave shall bargain and trade for himself, from the 20th September, till the first of May, and pass and repass from Livingston in Kentucky, to Morgantown in Virginia. However well satisfied the master may have been to turn his slave loose upon society, to bargain and trade for himself, and to ask of society to submit to it, yet it does not follow that society were bound to submit to it.
Without attempting to define what shall be the form of a lawful pass or permit to a slave; it may be safely affirmed, that no paper can be such a one, which on jfs face is iii violation of public policy and the security of society; which shews that the slave is going at large, to do that which is forbidden expressly by the statute law. That slaves shall not be frivolously arrested, when proceeding on the lawful businbss of the owner, or when acting in their proper and lawful sphere, by permission of tbe owner, is due to the master and to his right of property. That the master shall not let loose his slave, with a permit from him to violate the established order and economy prescribed by law in relation to slaves, is due to society. These interests of the master on, the one hand, and of society on the other, are con *551 cerned in the question involved in this controversy. But without abridging the lawful powers of the master, to use his property in the slave, it may be safely declared that this paper, given by the master to the slave, violated that duty which he as owner owed to the laws and to society.
Such a pass is a violation of the acts against permitting slaves to go at large and hir.e themselves, and against the act prohibiting trading with slaves.
The paper contained the master’s assent and permit to the slave, to go at large from September to May, from Smithland to Morgantown, to bargain and trade for himself. To bargain and trade for himself, contains an authority to hire himself, as well to buy and sell and deal in articles and commodities, without specification or limitation. These permissions, and such acts of the slave, are violations by master and slave, of the policy, spirit and letter of the statute of 16th December, 1802, against permitting slaves to go at large and hire themselves, 2 Dig. 1159; and ofithe 12th sect, of the act of 1789, 2 Dig. 1152, against buying, selling or receiving to, or from, or by a slave, without a note in writing from the master, expressive of the article. To pass and repass from Smithland to Morgantown; from the extreme south western to the north eastern limit of the State, and beyond, into Virginia, to range in this direction from September to May, bargaining and trading for himself, is certainly going at large, in hostility to the settled order intended to lie maintained by our statutes. Such licenses would tend to beget idle and dissolute habits in the particular slaves so indulged, as well as in others, and lead to depredations upon the property of others, and to crimes and insubordination. To such licences and indulgencies, society are not hound to submit, the master has no right to give such. Every person to whom such a permit was exhibited by a slave, might well suspect its authenticity. It was not a lawful pass or permit, it was a species of temporary and unlawful manumission, unlawful in its purpose and duration, wanting the solemn form, sanction, authentication and safeguard, as a deed of emancipation, and by its terms and purposes, shewing that the slave was not proceeding upon the lawful business. of t he master, but at the will and for the purposes of the slave himself.
Objects of the statúte authorizing the arresting of runaway daves.
Extract from ?,he statute.
i n an action by the owner, against a person for arresting his slave as a runaway, probable cause for suspecting he wasaruna1TN “ aJ"us"
*552 The second proposition couched under this motion for instruction is, that if this paper was in fact given by the master, and was shewn to Higbee, he is a trespasser. It proposes to make the question turn upon the proof of authenticity of this paper given to the jury; to try the fact whether the slave was in truth a runaway or not; to exclude the ques-1 ion whether Higbee had just or probable cause of suspicion, and to exclude the consideration of .all the other evidence of the circumstances winch induced the suspicion that the slave was a runaway. It is a truth, that running away from the master or owner, is in law an offence. The statute treats it as an offence in the slave; it is an offence, not against the master alone, but against the interests of society. The statute authorizing the arrest of persons suspected to be runaways, and directing the mode of proceeding in cases of arrest, intends to secure society against such offenders as runaways, and to protect the property of the master from loss by such offence, in providing the means whereby he may regain his property,
The statute declares and enacts — (2 Digest, 1105, chap. 164:) any person may apprehend a servant or slave, suspected to be a runaway, and carry him before a justice of the peace, who, if to him the servant or slave appear by the oath of the apprehender, to he a runaway, shall give a certificate of such oath” &c. The statute uses the words “suspected to be a runaway,” it authorizes the apprehender to act upon suspicion that such an offence has been committed. The question therefore, of justification to to the person arresting and proceeding against a slave as a runaway, turns upon probable cause of suspicion, not upon establishing the offence.
In suits for malicious prosecution, the defendant is not put to the proof of actual guilt, of the person who was arrested and prosecuted; but justifies by proof of probable cause. The defendant may plead the facts by way of justification; or give them in evidence on the general issue; hut in either way he is entitled to have the opinion of the court as to the probable cause. It is a question of law, resulting *553 from facts agreed by demurrer, orto be found by the jury. The question may be decided by the court upon plea, or by demurrer to evidence, or by way of instruction to the jury, according to the facts they shall find. The analogy between justification by probable cause, in an action for a malicious prosecution of one acquitted of an offence, and justification by probable cause for 'apprehending a slave suspected to be a runaway, but who turns out upon final issue, not to have been a runaway, seems to be the best guide which we have through this hitherto unexplored region of litigation.
Act prohibiting siaves lrom leaving the tenaments of theis owners without a pa§s.
Held the evidence did tie cause for the arrest of the slave,
The third section of the act of the 8th February, 1798, 2 Dig. 1105, provides that no slave shall go from the tenements of his master, or person with whom he lives, without a pass, or letter or token to show he is proceeding by authority from his master, overseer or employer; if he does, he is liable to be apprehended and carried before a justice, to be by his order punished, or not, in his discretion, with stripes. This statute does not provide for the cases of runaways, For a slave may go from the tenements of his master or employer, without a pass or letter or token, and yet be under no suspicion as a runaway. Absence from his home without a letter or permit, does not necesarily lead to the suspicion of his being a runaway; the circumstances may repel it. As if a slave is pursuing the course of service in which his master has been known to employ him, or from other circumstances, appears only temporarily absent, with intention to return in due time. So the production of a paper does not necessarily exclude probable cause of suspecting him to be a runaway; for the circumstances may lead to a suspicion that the paper is not of proper authority.
Considering the circumstances of this case as given in proof, the probable cause of suspecting the slave to have been a runaway, is manifest as the circumstances presented themselves to the taker-up, and to the justices. A slave, about two hundred miles from his alleged master, is found with two papers, containing a permit, unlawful upon its face, which no master was authorized to give bylaw, and *554 therefore, not to be presumed to have been given; slave and the master were unknown; one paper was endorsed with a certificate prepared to be certified by the clerk of the county court; but not signed, the other of the same character, purporting to be signed and sealed by the clerk, but bearing a date not yet arrived. That a clerk should have abused the seal and authority of his office, by affixing it to a paper, not proved nor acknowledged before him, at the request of some body, not staled in his certificate; a paper not by law authorised, to be proved in his office, nor to be certified by him, of an illegal and prohibited import^ bearing a date not then arrived, authorizing the slave to range at large, and bargain and trade for himself; was of itself, not to be presumed, and was just cause of suspecting the paper to be a forgery. The paper given in evidence by the plaintiff, bears date Sept. 28th; that is not signed by the clerk; the certificate was prepared only, and bad in style and orthography, but he did not sign it; the other paper of same import referred to in the warrant as of the 30th October, purported to be signed by the clerk.. All these facts combined, well justified at that time, the suspicion that the slave was a runaway, with false papers.
Taker-up of a runaway-slave belonging to a resident of the state, is not responsible for the error of the justice before whom he takes him, in ordering him to jail. instead of directing him to be taken home.
*554 The circuit judge, was, threrefore, warranted in refusing this, instruction; because the whole evidence taken together, well warranted Higbee at the time of the arrest of the slave, to suspect him as a runaway; probable cause of suspicion authorized the arrest, and the judge was bound to decide upon the whole evidence, and not upon a part only.
II. The second instruction asked, proposes as a legal consequence, that if Higbee, taking up the slave as a runaway, discovered that he belonged to a resident of the state, he was bound to carry him to the place from whence he fled or to the owner, and is answerable in damages, for the course adopted by the justice.
Higbee pursued the directions of the statute in carrying him before the justice; what was to be done with the slave, was a matter to be adjudged by the justice; he adjudged him a runaway, and com *555 mittecl him to jail. Higbee is not responsible for the misjudgment of the justice upon a matter within his jurisdiction.
Warrant of the justice committing the slave held not to be void, and is therefore a justification for the taker-up in delivering the slave to the jailer.
III. The third instruction moved, supposes the’ mittimus issued by the justice to be void.
This supposition is founded upon the commitment to jail ordered by the justice, instead of sending him by the taker up to the owner. The case stated in the mittimus, is one within the cognizance of the justice. He adjudged the slave to he a runaway; so far his authority and jurisdiction is clear. Upon this judgment, the statute authorized the justice to certify the distance between the place from where tho slave fled, and place of apprehending him &c. or, “if the owner be not identified to the satisfaction of the j «slice before whom he is taken, or reside not in the Commonwealth,” then the justice was by his warrant to commit the slave to jail. The warrant recites the oath of Higbee, that he had taken up the slave as a runaway, and as belonging to Jarrett of Livingston,, in this state; the justice then refers to the papers the slave had, and declares them forgeries in his judgment; and then he commits him to jail. The question what the justice should do with the slave, after being himself satisfied that he was a runaway, depended on the identification of the. -owner, “to the satisfaction of the justice;” if he was not satisfied who was the owner, he was right in committing him to jail, as fully as if he had been satisfied that he was not residing within the state. That he was not satisfied as to the true owner, comports with the order he made. Although Higbee may have described the negro as the property of Jarrett, of Livingston county, Kentucky;‘yet if Higbee’s information was founded merely upon the assertion of the slave and bis papers, vet t.he justice, might well bave doubted who was the true owner, after adjudging the papers to he forgeries. It is to he observed farther, that the pass or permit does not describe Allen as the property of Jarrett. We are bound to presume every tiling in favor of the judgment of the justice, which is consistent with the face of the warrant; and it may well be inferred *556 from tbe whole of the warrant, that the justice was not satisfied who was the true owner. It is true the warrant is inartificially drawn, hut it would seem, that the direction to the jailor to procure an answer from Jarrctt as speedily as possible, arose from a doubt whether Jarrett was the true owner. But he that as it may, the misjudgment of the justice upon, a matter clearly within his jurisdiction, and of which he had properly taken cognizance, cannot render the Warrant void.
'Wliero a slave is taken before a justice as a runaway, he has jurisdiction of the matter, and an erroneous judgment in ordering a commitment, is not void: and so the mittimus a justification to those acting under it.
Reasonable grounds to suspect a slave is a runaway, wq] justify the taking 1s„^1up as
*556 IV. The fourth instruction, asserts two propositions, which may he considered in an order inverted from that in which they stand in the bill of exceptions. First, the fact being known to the justice, that a runaway belongs to a citizen of this state, the justice has no jurisdiction to commit the runaway to jail; from that postulatum, the second member of the instruction is deduced; that the authority of the justice, as contained in the mittimus, is no justification for the defendant in delivering the slave to the jailor in obedience to it.
The first member of the instruction, as above stated, confounds want of jurisdiction, with misjudgment. Upon the carrying of the slave before the justice charged as a runaway, the jurisdiction of the. justice was complete, to hear and determine, whether he was a runaway, and what was to be done with the slave. He adjudged him a runaway; his misjudgment upon the evidence given, as to commiting the slave to jail, or sending him by the taker up to the master, or whether he was a runaway or not, cannot render the judgment void, as if coram non judice; nor avoid the justification to those who acted under the mittimus.
The court, therefore, properly refused the instructions asked by the plaintiff.
The first instruction as given by the court, declared that reasonable grounds to suspect the slave as a runaway, justifies the taker-up who acts in good faith. What has been said before is sufficient. This instruction is approved.
0f°t™eju™ioej like the findingof an inrhn.tnnftttf. hv probable cause. dictment by the grand ju-
Taker up is ^errorofí the justice-in committing, slave to '|ai ‘
Object oftbe statute con-
Argument— P™'VI11g Pr°b" believing the slave arunaway is a sufficatior¡ for apprehending bim>
The second instruction given, is also approved. The justice acted within the pale of his jurisdiction; his warrant of commitment is evidence of cause to suspect the slave to be a runaway. It is like the probable cause for prosecution, arising out of the finding of and indictment by the grand jury.
The third instruction given is also approved. The commitment was the act of the justice; for error or misjudgment of the justice, upon a case within his jurisdiction, the defendant was not responsi- , -, x ble.
What has been said, renders particular notice of the demurrers unnecessary; they were properly ruled by the court below.
The statutes, for apprehending and securing runaways; for preventing slaves from dealing, or being dealth with, without a written permit, expressive of the particular article, and against permiting them to go at large, and hire themselves; are intended as well to assure to the owners of slaves their property, as also to protect all property holders from the depredations of slaves. The wisdom of these provisions has been approved through a long lapse of years; in Virginia, before the separation, and in this state since. Experience teaches, that there is no danger to be apprehended from too great an alacrity, or passionate ardour, in apprehending slaves as runaways, without probable cause. The reward fixed by law for the service of apprehending or conveying a runaway to his owner, is no temptation to abuse.
It is of importance to the owners of slaves, and to all property owners, that these questions which have arisen in this cause be so settled as not to discourage the apprehending of slaves going at large, where there is probable cause of suspecting them to be runaways, it is ot importance to slave owners and others not slave holders, that slaves be not permifted to go at large, trading and dealing for themselves, escaping under color of a permit, which may or may not be genuine. Who would apprehend a slave as a runaway, (unless upon special request of *558 the master) if his justification for so doing is to depend, not upon the circumstances known at the time, but upon such as shall thereafter appear; not upon the probable cause for suspecting him to be a runaway, but upon his ability afterwards to establish the fact? The position will not do, that every slave unknown, producing a pass or permit from an unknown master, however liable to suspicion the pass and the slave may be, must be free from arrest as a runaway; or if arrested, the arrest must be at the peril of the taker up; that his justification must be tried by the after disclosed circumstances; that is, upon the fact of his being in truth a runaway. If probable cause of suspecting the slave as a runaway-will not do, if the adj udication of the magistrate upon the then known facts, and his warrant, consequent on his judgment will not do as justification; then nothing but pleading and proving the slave was in fact and truth a runaway will do. To plead that the slave had no pass, and therefore he was a runaway, and as such apprehended, will not do as a justification. The want of a pass only-, justifies punishment by stripes; to the mere want of a pass, permit or token, other circumstances must be added, he must be proved a runaway. To a plea of a want of a pass, the master replies and proves he was sent away, and was proceeding under his commands. Is such a slave a runaway? No. Then the absence of a pass alone, cannot prove the slave to be a runaway. The presence of a paper purporting to be a pass, cannot prove him no.t to be a runaway. The paper may be feigned and fabricated to facilitate the escape from the master. Neither the absence nor the presence of a paper, decides the question whether the slave is or is no.t a runaway; the concomitant circumstances create the suspicion and belief, that he is or is not a runaway.
The statute treats runaway negroes as offenders; it provides for the arrest of the offenders; the jurisdiction to hear and determine upon this offence, when charged, is vested in that numerous and respectable body of magistracy, to whom the law entrusts an authority and jurisdiction to cause all offenders against the penal laws to be arrested. Prob *559 able cause is sufficient to justify the arrest and commitment of any free person charged with an offence; it is sufficient to justify the prosecutor against action of the prosecuted after acquittal.- No sufficient reason is perceived, for laying down a different rule in the case of the arrest of ,a slave, charged with an offence. Why the arrest of a slave, charged as a runaway, or the right of the master in the services of his slave, shall be held more sacred, and better hedged and guarded, than the arrest of a freeman, and the rights of his liberties and character, let others tell. For such a why, we have not a wherefore.
Judge Mills’ dissent>
Under the existing law, authorizing any person to apprehend a servant or slave, “suspected to be a runaway,” and carry him before a justice of the peace, to be dealt with according to the judgment of the justice, under the provisions of the act, society has manifested no disposition to vex and harrass masters, by the arrest of their slaves, upon paltry and frivolous pretences. Whenever such a temper shall he displayed, or the rule shall appear too lax, the legislature can provide. If the owner of this slave has been put to inconvenience and expense in regaining the possession, in this instance, he ought to lay it to the account of his own indiscretion, in suffering his slave to go at large, and in furnishing him with papers of such questionable shapes, and of such unlawful import, as that every man who saw them, might well suspect that they were false, and fabricated by some bungler with intent to assist the slave in escaping from his owner.
From this opinion Judge Mills dissents; conceiving that leave to bargain and trade for himself, inserted in the permit, although illegal,’does not vitiate the authority to pass, which the master had a right to give; and that whosoever apprehends a slave to the prejudice of his master, acts at his peril, if he be not a runaway, and has a pass which is genuine; just as he would act in apprehending a supposed,felon. That the decision of justice of the peace, before whom the slave is taken, being exparte, and at the instance of the apprehender, cannot be conclusive upon the rights of the master. .
Dana, for plaintiff; Humphreys and Loughborough for defendant.
It is therefore considered by the court, Judge Mills dissenting, that the judgment be affirmed, with costs. I